> Decree affirmed and appeal dismissed at the costs of the appellant.

# Appeal of Edward Kelly, Jr.
# Appeal of Bridget Kelly, Administratrix.

1. However improvident a voluntary deed may be—even if it convey all the grantor's property—a court of equity will not decree its rescission where the transaction appears to have been the deliberate act of the grantor, who was at the time not mentally incapacitated, and it was not the result of actual fraud or undue influence by the grantee.

2. Especially will a chancellor refuse to interfere where it appears that after dispute arisen as to a reconveyance, the grantor and the grantee, acting independently and under the advice of their respective counsel, had entered into a compromise agreement whereby a part of the property was reconveyed by the grantee in full settlement of the disputes.

3. The requisites to warrant a court of equity in setting aside a voluntary deed, on the grounds of want of mental capacity by the grantor, and fraud and undue influence by the grantee, considered; and the facts of this case held not to justify such action.

November 7th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, GREEN and CLARK, JJ. STERRETT, J., did not sit.

APPEALS from the decree of the Court of Common Pleas No. 2, of *Allegheny county:* In Equity: Of October and November Term, 1884, Nos. 117, 145.

Appeal by Edward Kelly, Jr., from the decree of said court requiring him to deliver up certain deeds to be cancelled, and to reconvey certain real estate.

Appeal by Bridget Kelly, administratrix of the estate of Edward Kelly, Sr., deceased, from the same decree.

This was a bill in equity, and amended bill, filed by Edward Kelly, Sr., against Edward Kelly, Jr., averring that the defendant had obtained from complainant certain conveyances of

real estate and certain personal property without consideration, by fraud and undue influence, and at a time when the complainant was not of sound mind, memory and understanding, and praying for a decree that the defendant holds said property in trust for complainant; for a reconveyance, and an injunction, &c. The complainant died pending the suit, and his administratrix was substituted of record.

The defendant filed an answer, denying fraud, &c., and the cause was referred to a Master, who reported that the bill should be dismissed. On exceptions to this report the court reversed the Master's finding, and decreed a reconveyance by defendant, and other relief. Both parties took appeals from said decree. The pleadings, testimony and arguments, &c., were voluminous, covering nearly 1,000 printed pages.

The plaintiff charged in his original bill, in substance—

That in May, 1874, he was the owner of a large estate, consisting of real and personal property, which he had accumulated by his industry and economy, that he was not in debt to any considerable amount, and was in comfortable and easy circumstances. That during the fall of 1872 the defendant came to the city of Pittsburgh, without any means of any account, representing that he was a son of Michael Kelly and nephew of the plaintiff.

That on the 9th day of May, 1874, he (plaintiff) was injured by being thrown from a buggy; that by reason of the injury so received he was deprived of his reason and memory, and has no recollection of anything that occurred until about December 1st, 1874, and no clear recollection of events as they happened until the early part of the summer of 1878; that prior to being hurt he had employed the defendant as his agent to collect the rents and attend to other matters of business for him, he providing for the defendant, who boarded and lived with him. That on August 3d, 1872, plaintiff's only remaining child, John S. Kelly, was killed by being thrown from a buggy.

That after the injury to the plaintiff on May 9th, 1874, the defendant took charge of all his property, real and personal, and of his business; that on November 10th, 1874, the defendant procured from him a conveyance, by two deeds of that date, of all his real estate, valued by him at $150,000. That the conveyance was without consideration, and was a gross fraud, perpetrated upon him when he was not of sound mind and memory, and when he did not know what he was doing, which facts must have been known to the defendant; that at the time of executing these deeds the defendant signed a paper (exhibit "C,") providing that defendant should hold certain of said real estate in fee, and certain other thereof

during plaintiff's life, and then convey the same to certain persons therein named, of which paper he has no knowledge or recollection, and which he charges was a part of the fraudulent transaction to deprive him of his real estate.

That he has an indistinct recollection that, after his mind and memory were getting somewhat better, that the defendant gave him a paper signed by him (exhibit "D,") assigning to plaintiff the rents to accrue from certain real estate; that the date of said exhibit "D" appears to have been erased and filled in April 18th, 1876.

That the defendant had the possession of his personal estate, and received the rents of his real estate from said May 9th, 1874, to May, 1878, and that with the receipts therefrom purchased certain real estate, described in the bill.

That a part of the property of which the defendant has defrauded him he conveyed back to him, by two deeds dated May 15th, 1878, and expressly charges that all and every transaction prior to the execution of the deeds of May 15th, 1878, and said deeds themselves, except so far as they are manifestly for his benefit, if made or done by him after May 9th, 1874, were done and made when he was not of sufficient mental capacity to know and determine what he was doing, were without consideration, and an attempt to plunder him of his property.

To the allegations and averments of the bill the defendant answered—

That prior to November, 1872, he was living in Ireland with his mother, and in comfortable circumstances; that after the death of plaintiff's son, about August 3d, 1872, the plaintiff wrote to him urging him to come to Pittsburgh to take charge of his property, promising him as an inducement that he would make him his sole heir-at-law if he would comply with his request; that yielding to these persuasions he left Ireland and came to Pittsburgh in November, 1872, and presented himself to the plaintiff, who well knew him to be the son of his brother, Michael Kelly. That upon his arrival he found the plaintiff in good condition, sound in mind and perfectly competent to attend to business for himself and others, and continued so until May 9th, 1874, when, as the result of an accident, the plaintiff was injured very badly; that immediately after the injury for a couple of weeks plaintiff was perfectly sound in mind; that after this, and for a period of one or two weeks, as a result of medicines and the fever consequent upon receiving the wound, he was slightly deranged in his mind; that after this time and up until the time of filing the answer, the plaintiff has been and continued in a perfectly sound condition of mind, fully competent to and did perform

all kinds of business transactions, both for himself and for others.

That on March 21st, 1874, some time before plaintiff received his injuries, the plaintiff, without any solicitation from him whatever and without his knowledge, procured to be written by his own attorney a deed of conveyance for all plaintiff's real estate, and a bill of sale for all his personal property to him, purporting to be in consideration of one dollar in each instrument; that plaintiff took him down to his attorney's office, and in the presence of witnesses executed the said deed and bill of sale, signed the receipts for the purchase money, was paid the two dollars purchase money by him, and then delivered both the completed instruments to him and delivered to him possession of all the property, real and personal; that the plaintiff was at this time in complete possession of mind, memory and understanding, and no advantage, fraud or imposition of any kind was practised upon him, it being considered, and so expressed by the plaintiff, a voluntary gift accompanied by delivery of possession, and done by him in furtherance of his promises made to induce him to come over from Ireland.

That at the time of delivering said deed and bill of sale, plaintiff verbally reserved that he should provide a living for plaintiff all his life and give him the full use of the house, No. 105 Ross street, during life; also, that the property mentioned in the said deed should be held by him for about the same uses and purposes set forth and contained in exhibit "C"; that long after plaintiff had received the injury of May 9th, 1874, to wit: on November 10th, 1874, and having fully recovered from the effects of said injury, and being sound in memory, mind and understanding, and fully competent to do business of all kinds, the plaintiff "desired" him, as there was no written evidence of the trust, so verbally agreed upon, that the said trust be put into writing, to which he consented; whereupon the plaintiff caused to be made, executed and delivered, two deeds, and made and procured him to execute said exhibit "C"; that these last three instruments were made, executed and delivered, to take the place of the deed of March 21st, 1874; that he still remained in entire possession of all of said property, and that the agreement to provide for the plaintiff and allow him the use of the said house during life was continued.

That in compliance with his agreement of March 21st, 1874, as soon as he took possession of the property he commenced to provide for the plaintiff in every way desired, and to attend to his wants, and allowed him the free, full, entire and uncon-

trolled use of the said house, keeping it in repair and paying all taxes until May 7th, 1878.

That from the time of his arrival in 1872, the plaintiff and he continued to live together upon terms of unusual friendship, sociability and companionship, he caring and providing for all the plaintiff's wants, until in the month of March, 1878, at which date the plaintiff married a young wife. That from the time of said marriage differences arose, and resulted in the plaintiff, through his counsel, demanding from him a re-conveyance of the property; that on account of the relationship existing he took every measure possible to obtain a compromise and avoid legal proceedings; that the plaintiff, assisted by his counsel and agent, finally agreed with him upon a compromise, as set forth in a written agreement, dated May 7th, 1878 (exhibit " A," infra); that the plaintiff was, at the time when he made said settlement, and signed the agreement, of sound mind and memory, and expressed himself fully satisfied therewith.

That defendant has complied with all the conditions required of him by said agreement of compromise, and from the time of signing it, had accepted it, and acted under it in full faith. That from the date of the original deed, until the date of the compromise, he had possession of, and received the profits of said property; that the income so received, was almost, if not entirely used, in keeping and caring for plaintiff, paying debts, taxes, insurance, and in carrying out the terms of the agreement of compromise; that at the time of said settlement, the plaintiff and his counsel were perfectly cognizant of the state of the property, and the encumbrances upon it.

The " compromise agreement," annexed to the answer, was as follows:

### EXHIBIT "A."

By the aid and advice of counsel, the undersigned agree to compromise and settle all disputes between them, on the following terms and conditions, viz.:

1. Edward Kelly, Jr., shall convey to Edward Kelly, Sen., the following described real estate, viz.: That known as the Gumbert property, situated on Fifth avenue, Pittsburgh, being 112 x 200 feet; also that known as the Tannehill and Webster street property; also that known as the Dinwiddie street property, being 44 x 90 feet; also that known as the Manor street property situate South Side, city of Pittsburgh. For a more particular description the deed of Edward Kelly, Sen., to Edward Kelly, Jr., is referred to and made part

12 OUTERBRIDGE—3

hereof. Said deed being known as the trust deed. Also lot No. 105 Ross street; also lot No. 103 Ross street; also lot corner Ross street and Fifth avenue; also lot 183 Fifth avenue, Pittsburgh.

2. The said Edward Kelly, Jr., also to deliver to Edward Kelly, Sen., the one half of the whiskey stored at No. 14 Wylie avenue, Pittsburgh; also the one half of all personal property, including the Dean mortgage, Pan Handle Railroad claim; also the one half of all choses in action and claims due said parties of every kind, including all uncollected rents.

3. Each party to pay the one half of all the debts incurred for the benefit of the real estate above described, including the personal debts of the said Edward Kelly, Sen., for borrowed money from the following persons, viz.: William Wilkinson, Pat. Shaugnessy, Frank Shaugnessy, Mary Miley, Julia McCaully, Fergus Hawley, Bridget Hall, and Ellen Cavenaugh.

4. Edward, Jr., shall furthermore pay counsel fees for Edward, Sen., to the amount of $1,500.

Witness our hands and seals this 7th day of May, 1878.

                    EDWARD KELLY, JR.  [L. S.]
                    EDWARD KELLY, SR.  [L. S.]

After the filing of the answer and reference to an examiner, the plaintiff filed an amended bill charging—

That since his partial restoration to health, he has learned that by reason of the shock he sustained by the killing of his son, on August 3d, 1872, his general health and mental faculties became seriously impaired, and at the time he executed the deed and bill of sale, of March 21st, 1874, he was in a broken and feeble condition physically, and of weak and unsound mind, wholly unfit to transact business, or to execute said instruments, and that by reason of his weak mental state, was completely under the influence of the defendant; that at that time, and for a considerable period prior thereto, the defendant was his confidential and trusted agent in all his business affairs, and had the entire management of his estate and that said deed and bill of sale were procured by the undue influence exercised by the defendant over him; that in accepting said deed and bill of sale, the defendant was guilty of a gross violation of the duty he owed to him by reason of the confidential relation in which he stood to him.

That in the so-called agreement of compromise, a cruel deception was practised upon him by the defendant; that the defendant retained the productive and unincumbered real estate, while he turned over to him property yielding but little income and heavily encumbered with liens.

The cause was referred to Albert N. Sutton, Esq., as Master, whose findings of fact and conclusions of law were as follows :

The testimony in the cause is very voluminous . . . . . and may be briefly stated as showing—

That the plaintiff was and had been for many years prior to 1872, a resident of the city of Pittsburgh, that during this time he had established a reputation of being an unusually shrewd business man, and had by his industry and business tact accumulated a large amount of real and personal property—that on August 3d, 1872, his son and only living child was killed by being thrown from a buggy, that shortly after the death of the son correspondence was had between the plaintiff and the defendant, a son of Michael Kelly, brother of plaintiff, and then living in Ireland, that as a result of this correspondence the defendant came to Pittsburgh in November, 1872; he was received by the plaintiff as his nephew and the two continued to live together upon terms of intimate social and business relationship from the time of his arrival up to the time of plaintiff's marriage, the plaintiff having shortly after the arrival of the nephew, intrusted him with the charge of his business; that on the 21st of March, 1874, the plaintiff executed and delivered to the defendant a deed for all of his real estate and bill of sale of all his personal estate for the consideration expressed of $1.00 each, which sum was paid by the defendant and possession delivered by the plaintiff; that at the time of the transfer a verbal agreement was entered into between the plaintiff and the defendant, whereby the defendant agreed to provide for all the wants of the plaintiff during life, including the use and occupancy of the house No. 105 Ross street, and to convey a certain portion of the real estate after the death of the plaintiff to certain beneficiaries then agreed upon. On the 9th of May, 1874, the plaintiff was injured by being thrown from a buggy and was confined to his room some time on account of it. On November 10th, 1874, having recovered from the effects of his injuries, two deeds were prepared under his instructions, duly executed and delivered by him to the defendant. These covered the same property embraced in the deed of March 21st, 1874, and were absolute conveyances. At the same time the plaintiff had a declaration of trust (Ex. C, plaintiff's bill) covering the property conveyed by one of the deeds (Ex. A, plaintiff's bill) which was executed by the nephew (defendant) and delivered to the plaintiff and was in substance the verbal agreement of March 21st, 1874, so far as said verbal agreement related to the disposition of the property after plaintiff's death. In the latter part of December

1874, or early in January, 1875, these papers were by direction of the plaintiff submitted to J. E. McKelvy, Esq., for examination, and if found to be in proper form, recorded, and the deeds were on January 7th, 1875, recorded in the office for recording deeds in Allegheny county. In the spring of 1876 these papers were by the plaintiff in person again submitted to Mr. McKelvy, and under the instructions of plaintiff a paper similar to Exhibit D, plaintiff's bill, was prepared, signed by defendant and delivered to the plaintiff. This paper was a transfer to the plaintiff by defendant of all the rents, issues and profits of the property during life for the period intervening from the spring of 1876 to March, 1878. There does not appear from the testimony to have been any change either in the social or business relationship of the parties.

About March, 1878, the plaintiff married and shortly after made a demand upon the defendant for a reconveyance of the property. Counsel were employed by both parties, and on May 7th, 1878, resulted in the compromise agreement and the execution and delivery of the deeds of May 15th, 1878, and division and delivery of the personal property as provided for by the agreement.

In the consideration of this cause we deal exclusively with the parties to the several conveyances and contracts, no intervening rights or parties are involved, and from this position the pleadings and testimony present as questions for our determination—Is the conveyance of March 21st, 1874, voidable, by reason of the mental incapacity of the grantor, or by reason of the confidential relationship existing between the parties? *If* voidable by the grantor for either of the above reasons, what effect is to be given to the execution and delivery of the deeds of November 10th, 1874; the recording of said deeds under the instructions of the plaintiff on January 7th, 1875; the transfer of the rents during plaintiff's life by articles of agreement prepared under his instructions by Mr. McKelvy in the spring of 1876; the agreement of compromise of May 7th, 1878; acceptance of deeds and of possession of property, real and personal, in pursuance of it?

The first branch of the first proposition involves an examination as to the mental capacity of the plaintiff to make the conveyance of March 21st, 1874, as the execution and delivery of the instrument does not admit of question. It is well established both at law and in equity that a man may allege his own incompetency to avoid his deed; in other words, may stultify himself, and that the burden of proving the incompetency of a contracting party is upon the one who objects to the validity of the contract: Clifton *v.* Davis, 1 Parson's Eq. Cas. 31. This question could not arise upon the original

pleadings, the original bill alleging in the second paragraph, " that the plaintiff was injured on the 9th of May, 1874," and in the third paragraph, " the facts to be that he was by his injuries entirely deprived of his reason and memory," while in the eighth paragraph he expressly alleges and charges that all and every transaction made prior to the . . . . . 15th day of May, 1878, . . . . . . and subsequent to the 9th of May, 1874, were done and made when he was not of sufficient mental capacity to know and properly determine what he was doing." It is thus plainly presented that at the time of the filing of the bill, the 9th of May, 1874, was the date and the injury received upon that date the cause of the alleged mental incapacity, by reason of which the plaintiff sought to have the " deeds, trusts and agreements as in the bill set forth decreed null and void."

The answer was filed to the allegations contained in the bill, issue joined, master appointed and the taking of testimony proceeded with for more than six months when the amended bill was filed, setting up a new cause of injury and extending the time of the alleged incapacity back to August, 1872.

Upon the question of fact as to the competency of the plaintiff to intelligently make a disposition of his property at the time of the execution of the deed of March 21st, 1874, the burden of proof is upon the plaintiff. The testimony shows that prior to August, 1872, the plaintiff had the reputation of being a shrewd business man, was made the custodian of the savings and acted as the business adviser for many of his neighbors; that the violent and unexpected death of his son at this time was a great shock to him. Upon this point some of the plaintiff's witnesses testify to what seems to them strange remarks and peculiar conduct upon the part of the plaintiff during the " wake " preceding the burial of his son's body and immediately succeeding the time of his loss. These facts, when considered under the circumstances in which they took place, are, in our opinion, more indicative of the grief and excitement attendant upon the loss he had sustained than of mental weakness or permanent impairment of mental capacity; but time, the great assuager of grief, seems to have relieved the plaintiff from the excitement immediately attendant upon the event, for shortly afterwards we have the testimony of Mr. Doloughty, showing knowledge and capacity to attend to matters of business in the making of the contracts for a monument to be erected over his son's grave, and in September, 1873, taking charge of a complicated partnership settlement then pending before a board of arbitrators, in which his son had been one of the partners, and which continued for over two years; that he was during this time an acceptable

indorser of notes for different parties, and, in fact, was attending to business in about the same manner that he had prior to his son's death. Covering the time from the death of the son to and including the date of the conveyance, we have the testimony of John J. Mitchel, Esq., a member of the bar of Allegheny county for almost forty years, of high standing and reputation in the community and among the profession, who had known the plaintiff for thirty years, was a member of the same church, and was at this time acting as attorney for the plaintiff before the arbitrators in the partnership matters above referred to, and who was employed by the plaintiff to prepare the deed of March 21st, 1874. Mr. Mitchel states: "At the time Mr. Kelly (plaintiff) made those first deeds in March, 1874, the question of Mr. Kelly's sanity never presented itself to my mind. I had no reason whatever to entertain a doubt upon the subject. . . . . . I certainly considered he was then of sound mind." The long personal acquaintance of Mr. Mitchel with the plaintiff, his professional experience and training, with his immediate association with the plaintiff on professional business, entitles his opinion and testimony to great weight; and being corroborated, as it is, by the facts stated, we are of the opinion that the plaintiff has not sustained the allegation of mental incapacity at the time of the execution and delivery of the deed of March 21st, 1874, as alleged in the amended bill.

. Upon the second branch of the first proposition, arising, as it does, from the admitted confidential relation existing between the parties, we are called upon to examine into the circumstances attendant upon the execution and delivery of the deed, as also any indication of undue influence upon the part of the defendant, or advantage taken by reason of the existing relationship, and upon this point we submit, as a general proposition of law that is well established—

That the perfect right of a proprietor to divest himself of his estate by way of gift, uninduced by pecuniary consideration, is among those which do not admit of question, and when such a gift is executed or otherwise fixed in the beneficiary, either by the direct conveyance of an estate or the creation of a use, it is beyond the power of the donor or his representative to revoke it; but when, as in the present case, a relation of trust and confidence is admitted to exist between the parties, the burden is thrown upon the beneficiary to establish the perfect fairness of the transaction, and that it was the deliberate act of the confiding party, after being fully informed of his rights, interests and duties, and put upon his guard against even the suggestions of his own inclinations.

Under the facts in this cause the burden of proof is upon

the defendant to establish the perfect fairness of the transaction. Upon the circumstances attendant upon the preparation and execution of the deed we have the testimony of Mr. Mitchel, who in this instance seems to have acted not only as attorney, but also as friend, counselor and adviser. From his testimony it appears that the deed was prepared under the instructions of the plaintiff; that he (the plaintiff) had the custody and possession of all the title papers of his property; that the defendant was not present, and took no part either in the consultation regarding the transfer or the preparation of the deed; that his (plaintiff's) intention to make such a transfer was made known to his counsel, who advised him fully as to all the consequences thereof, as stated by Mr. Mitchel: "I told him that would be a very unwise thing for him to do. If you make a deed of all your property to your nephew, you will place yourself absolutely in his power. . . . We had considerable conversation on the subject, in which I raised all the objections I could." After this consultation with his counsel the plaintiff left the office, but returned either the same or the next day, bringing with him the several deeds for his real estate, and gave instructions for the preparation of the deed of March 21st, 1874. A day or two was consumed in preparing the deed, during which the plaintiff called several times at the office to make inquiry as to the progress being made. After its preparation and before execution, it was submitted to the plaintiff, who upon examination found it to contain a piece of property which he had previously sold, and this was made the subject of consultation with his counsel. These matters having been disposed of, the plaintiff brought the defendant to Mr. Mitchel's office, when the deed and bill of sale were signed and acknowledged, the consideration paid and the papers delivered to the defendant, Mr. Mitchel being one of the subscribing witnesses.

In no instance during this whole transaction does the hand or influence of the defendant appear, either directly or indirectly. On the contrary, the testimony of Mr. Mitchel, as above stated, and the declaration of the plaintiff, made in 1878, four years after the transaction as testified to by Captain Ward, "that all the lawyers in town would not have made him deviate from what he intended to do," show this transfer to have been the deliberate act of the plaintiff, when in the full possession of all his faculties, after consultation with able and disinterested counsel of his own selection, who had fully informed him of the consequences of his act, cautioned him against it, and done after time for deliberation after having been advised of the consequences of the proposed act.

The facts in the cause do not, in our opinion, justify judicial

interference by the setting aside of the contract so deliberately entered into, and that the said deed is not voidable by reason of the confidential relationship of the parties.

This leaves for our consideration the effect of the deeds of November 10th, 1874, the recording of these deeds under instructions of the plaintiff in January, 1875, the preparation by Mr. McKelvy of the agreement for the transfer of the rents, under the direction of the plaintiff, in the spring of 1876, and plaintiff's acceptance; the agreement of compromise of May 7th, 1878; the acceptance of the deeds, and delivery of property, real and personal, in pursuance of it. The consideration of this proposition involves an examination into the issue presented by the original bill and answer and the testimony thereon. The original bill, as before stated, fixed May 9th, 1874, as the date and the injury of that date the cause of the alleged mental incapacity. The effect of the testimony upon this point is weakened by the fact that prior to sustaining this injury the plaintiff had executed and delivered to the defendant a deed for the same real estate.

In respect to the injuries we find as facts:

That on May 9th, 1874, the plaintiff was injured by being thrown from a buggy; that from the effects of the injury his life was despaired of, even by his attending physician; that on June 26th, 1874, he had so far recovered as to render further medical attendance unnecessary, and was able to go about the yard. His attending physician, Dr. Shaw, testifies that from the time he quit attending him (June 26th) in 1874, he frequently saw him on the street and regarded him physically all right, and saw nothing wrong with him mentally.; that passing him on the street he would suppose him to be mentally all right. Immediately after his recovery, Mr. Kelly resumed his attendance before the arbitrators, and Mr. McLean testified that he saw no material change in his condition from what it had been before the injury. In the preparation of the deeds and declaration of trust of November 10th, 1874, Mr. Mitchel was employed by the plaintiff, and the papers were prepared under instructions received from him (the plaintiff). Mr. Mitchel testifies "that at the time his mental condition was good; that he saw no perceptible failing in his mental condition from the preceding spring." .

The deeds and declaration of trust of November 10th, 1874, were, prior to January 7th, 1875, within two months of their execution, submitted to J. E. McKelvy, Esq.; upon this matter Mr. Doloughty testifies, that under the instructions of the plaintiff, he and the defendant submitted the deed to Mr. McKelvy for his examination and if found by him to be correct, they were to be recorded. Mr. McKelvy having examined

the papers, and reported that they were in proper legal form the deeds were with the approval of the plaintiff, on January, 7th, 1875, recorded.    Afterwards the plaintiff called in person upon Mr. McKelvy to prepare a paper as testified by Mr. McKelvy, as being similar to exhibit D., plaintiff's bill.    This paper was prepared under the instructions of the plaintiff, in March, 1876, was executed by the defendant, and delivered to and accepted by the plaintiff.    Mr. McKelvy further testifies that at this time he considered the plaintiff "a sane man mentally, undoubtedly; physically he appeared to be in good health, looked as well as he does to-day." . . . . " I certainly regarded him as a sane man, or I would not have transacted any business with him."

From all the testimony bearing upon these transactions, we are of the opinion that they were the deliberate acts of the plaintiff, made when fully competent and advised of their effect, and were the voluntary acts of the plaintiff uninfluenced by the defendant, and were but the carrying into present effect the promises made to the defendant, by which he was induced to come to this country—and in this view we are sustained by the declaration of the plaintiff testified to by Captain Ward, as made in the presence of himself and G. L. B. Fetterman, Esq., when in consultation over these deeds after the marriage of the plaintiff in the spring of 1878. When Mr. Fetterman stated " that if he (plaintiff) had come to him to get the papers drawn, he would never have drawn that kind of a deed, he (plaintiff) said, " there was no use in talking that way; that all the lawyers in town would not have made him deviate from what he intended to do," and his statement to the same parties, " that it was not such a foolish thing " as Mr. Fetterman and Captain Ward were talking about; " that he (plaintiff) had a paper drawn up by which he was to get all the rents and profits."

. From the time of the execution and delivery of the paper prepared by Mr. McKelvy in March, 1876, transferring to the plaintiff the rents and profits of the property during life, until the marriage of the plaintiff, in March, 1878, there seems to have been no change either in the status of the parties or of the property; but soon after this latter event trouble arose between the plaintiff and defendant, resulting in a severance of their social relations, and a demand upon the part of the plaintiff for a re-conveyance.  Counsel were employed by both parties, and after some time spent in negotiation between the counsel and parties, an agreement of compromise was entered into on May 7th, 1878, which was signed by both plaintiff and defendant.    This agreement was carried into effect by the

execution and delivery of deeds for the real estate, and delivery· by the plaintiff to the defendant of the possession of the property, both real and personal, as provided for by the agreement, and the assumption of the debts mentioned.   The deeds for the real estate were accepted by the plaintiff, and under his instructions entered for registry in the City Engineer's office and for record in the Recorder's office, and possession taken of the property, both real and personal.

The testimony as to all the circumstances connected with this agreement of compromise is very full, and in our opinion establishes beyond.question the competency of the plaintiff to know and understand the nature of all that transpired; that he was consulted with and advised of its effect, and that during the negotiations took an active part in the management and direction, and that he understandingly entered into the agreement of May 7th, 1878, received the consideration agreed upon, and has received and enjoyed the benefits thereof.

The allegation that his signature to the agreement of compromise was obtained by misrepresentation, although in our opinion immaterial so far as the rights of the defendant are concerned, as it is not charged that he was a party to it nor is such an inference justifiable from the testimony, is contradicted by the subsequent acts of the plaintiff, as it is shown by the plaintiff's testimony that on the morning after signing the agreement, to wit, May 8th, 1878, the plaintiff obtained a copy of the agreement, that this agreement was then made the subject of discussion and consultation with his counsel, that he accepted the deeds of May 15th, 1878, made in pursuance of its terms, that he took and has retained the possession of the property, both real and personal, obtained by means of this compromise agreement, and as a proposition of law, having accepted and retained the benefits of this contract after the discovery of the fraud alleged by him, affirmed the validity of the original contract: Pearsoll *v.* Chapin, 8 Wright 9; Negley *v.* Lindsay, 17 P. F. S. 227; Seylar *v.* Carson, 19 P. F. S. 88.

In conclusion I am of the opinion from the testimony in the cause that the complainant has not sustained the allegations as set forth in the bill, and is not entitled to the relief prayed for, and I think therefore that the bill must be dismissed, with costs.

Plaintiff filed the following exceptions to the Master's report:

1. The Master erred in finding that the instruments of writing under which the defendant claims title were the free, voluntary and conscious act of the plaintiff; he should have

found that they were each and all executed while said Edward Kelly was incapable of doing a binding act.

2. The Master erred in finding that they were not procured each and all by undue influence; he should have found that they were procured, each and all of them, under circumstances of suspicion and through the fraudulent acts of the defendant.

3. The Master erred in finding that the compromise arrangement, so called, was of any validity; he should have found that it was without consideration, fraudulent and void.

4. The Master erred in his finding as to the burden of proof.

5. The Master erred in his finding as to the law applicable to the facts in evidence.

6. The Master erred in not finding the defendant's title void, or at least voidable, and in not decreeing that it be voided.

7. The Master erred in not finding that the plaintiff was entitled to the relief prayed for in his bills, and in refusing to decree accordingly.

8. The Master erred in his conclusions as to the facts and law of the case.

The court, after argument, sustained the material exceptions, in the following opinion by WHITE, J.:

In the fall of 1872, the plaintiff, an old man, who had acquired, by great industry and frugality, considerable property, worth more than $100,000, was living by himself. The last member of his family, an only son, to whom he was devotedly attached, had been suddenly killed by an accident in August of that year. About the first of November the defendant, a nephew, arrived from Ireland, was most kindly received, and taken into his house and home by the uncle. They lived together on the most intimate terms until the spring of 1878. During that time the nephew had the entire management and control of his uncle's property.

On the 21st of March, 1874, less than 18 months after the defendant's arrival in this country, the plaintiff executed two deeds, for the consideration of two dollars, conveying to the defendant all his property, real and personal, absolutely. Those deeds were never recorded and not made public until after this bill was filed.

On the 10th of November, 1874, the plaintiff executed two other deeds, nearly identical with those of March, conveying to defendant the same property, in fee simple. These deeds were recorded January 7th, 1875. At the time these last deeds were executed the defendant executed a paper, which was not recorded, reciting that he held the property described

in one of the deeds, as trustee, (1), "for his own use, profit, benefit and advantage and free from any impeachment of waste," during the life of Edward Kelly, Sr, and (2), within three months after his death, to convey the same, as therein · stated, to certain relatives of Edward Kelly, Sr.

· By these conveyances the old man divested himself of all his property, left nothing to live upon, and had nothing to show that his nephew, in whom he had vested all his property, without consideration, was even to keep him while he lived.

Some time in 1876 an informal paper was drawn up, in which the defendant assigned to the plaintiff all rents accruing after that date, on all the properties, during plaintiff's lifetime, he to pay all taxes, repairs, &c. This paper was never acted upon; the defendant continuing to rent and manage the property, and receive rents, the same as before.

In March, 1878, the plaintiff married again, and soon after employed counsel, Messrs. Weir and Gibson to recover back his property. No suit was brought, but negotiations entered into for a compromise. A paper, called a "compromise agreement," was signed May 7th, 1878, by which the defendant agreed to convey back a part of the property, the plaintiff to pay certain debts, and the defendant to pay counsel fees for the plaintiff to the amount of $1,500. In pursuance thereof the defendant executed to the plaintiff a deed for that part of the property, May 15th, 1878.

In October following this bill was filed, alleging fraud and imposition practiced upon the plaintiff, when he was not in a mental condition to understand what was done, and praying for a reconveyance of all the property.      :

To enable the plaintiff to recover he must establish two things: first, fraud or imposition in the original conveyances to the defendant, and second, fraud or imposition in the alleged compromise. The plaintiff claims that he was so depressed by his son's death in August, 1872, and by an accident that happened him in May, 1874, being thrown from a buggy and nearly killed, that for several years he was mentally incapacitated. Twenty-two witnesses have testified to this fact, and stated the grounds of their opinion, making out a strong case. But the witnesses for defendant, less in number but quite as strong in their statement of facts, testify to his capacity, except for a few weeks after the accident in May, 1874. On this point the Master finds against the plaintiff, and we cannot say his finding is erroneous.

. On another ground, however, we think the Master erred. He should have found the deeds of March 21st, 1874, and November 10th, 1874, fraudulent in law because of the confi-

dential relations existing between the plaintiff and defendant. This relation of implicit trust and confidence — of almost helplessness—of the uncle in his nephew, is clearly set forth in defendant's answer : " Prior to November, 1872," he says, " I was living in Ireland with my mother ; plaintiff wrote frequently to me urging upon me that he *was a very old man, had a great deal of property and no person attending it ; that it was wasting fast because he was unable to care for it,* and that he desired me to come over *and take care of it for him,* promising as an inducement that he would *make me his sole heir at law* if I would comply with his request. . . . . . From the time of my first coming the plaintiff *gave me entire and only charge and control of his whole property ; we, the plaintiff and myself, lived together, everything being in common ;* I did not charge anything for attending to the business on account of the understanding frequently expressed by plaintiff that the entire property was intended for me *after plaintiff's decease.* . . . . . The plaintiff and myself, from 1872, the time of my first arrival, *continued to be upon terms of unusual friendship, sociability and companionship, living together, and I cared for the plaintiff, supplying all his wants and cares* until in the month of March, 1878, at which date plaintiff married a young wife."

The evidence also shows that the defendant did not think his uncle was fit to attend to his property. James Craggan testifies that young Edward told him that " his uncle wasn't able to attend to any business ; that he wasn't competent to do anything." Father Mollinger testifies to conversations with the defendant in which he said, " that his uncle was in a state not able to administer his own estate ; that he was incompetent ; that people imposed upon him." . . . . . " His uncle was in such a state that he was incompetent to administer his affairs, and so, in order to protect it, the estate of old Mr. Kelly was transferred to him, with the best of intentions to preserve it." . . . . . " That if the old gentleman had asked him nicely for it, he would have returned it to him." . . . . . " That it was only to preserve it, because the old man was acting in such a way that the whole estate would have been lost." . . . . . " That he was interested in it, and therefore thought it was right he should take it in his name to preserve it." . . . . . " That he was not of sound mind—he didn't act as a man that was of sound mind, because he did things, indorsed notes, etc., that he didn't remember."

Christian Mueller, who was a tenant in one of the houses, testifies to a conversation with the defendant, in which he said that his uncle " was unfit to attend to business, that he was nothing but an old fool, an old crazy fool."

The defendant, in a letter to J. D. W. White, April 19th, 1878, says, speaking of the plaintiff, "Now he is in his old age and in his dotage, his wife can command him as she would a child, and which is worse, he is not able to attend to any business, *nor did he do so for over four years past.*"

While the defendant denies he used the expressions testified to by those witnesses, yet it is very likely he said something of the kind, for they are in harmony with the language in his letter to Mr. White, which he admits is in his handwriting. These may not be sufficient to establish the incapacity of the plaintiff, but they have an important bearing on the deeds executed in 1874. Taken in connection with what is quoted from his answer, they show an eagerness on the part of the defendant to make his "sole heirship" sure by getting the title to the property in advance of the old man's decease. He says that when the deeds of March 21st, 1874, were executed, there was a *verbal understanding* he was to support the plaintiff, give him the use of one house while he lived, and that a portion of the property was to be held in trust for other heirs at the plaintiff's death. As the trusted agent and bosom friend of his old uncle, he should not have accepted such deeds with a *verbal understanding* such as he states, leaving his old uncle penniless and helpless in case of his own death, or with the power to cheat the other heirs in case of his uncle's death. It was a gross imposition and fraud in law.

Even when the deeds of November 10th, 1874, are executed, no provision whatever is made for the support of the plaintiff while he lives, except a *verbal understanding.* Good faith and common honesty towards his feeble old uncle, who implicitly trusted him and confided to him the entire management of all his affairs, required that he should not take all his property without making an adequate and safe provision for his support, and also make sure his trust by putting that deed on record.

The evidence shows that the deeds of March, 1874, and also of November, were prepared at the instance of Edward Kelly, Sr., and when Edward Kelly, Jr., was not present. But he was present when they were executed, and actually paid over the two dollars, the consideration mentioned in the deeds, to his uncle. The absurdity of such a payment is suggestive. Was it a childish freak of the old man? Or had he been told that such a formality was necessary to make the transaction stand?

The evidence does not establish *actual* fraud in procuring the deeds from the plaintiff. Nor is that necessary. The case comes under the other branch of equity, *constructive* fraud, arising out of the peculiar confidential and fiduciary relations

of the parties. "In this class of cases," says Judge STORY (Eq. Juris., § 307), " there is often to be found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which courts of equity act in regard thereto stands independent of any such ingredient, upon a motive of public policy; and it is designed, in some degree, as a protection to the parties against the effects of overweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment." " The general principle," he continues (§ 308), " which governs in all cases of this sort is, that if a confidence is reposed and that confidence is abused, courts of equity will grant relief." The principle is applied to gifts between parent and child, guardian and ward, client and attorney, medical adviser and patient, principal and agent, etc. The doctrine is applied to many other cases (§ 323), " wherever confidence is reposed and one party has it in his power, in a secret manner, for his own advantage, to sacrifice those interests which he is bound to protect, he will not be permitted to hold any such advantage."

Nor is it a sufficient answer that Edward Kelly, Sr., knew what he was doing and appeared to act voluntarily, without any influence on the part of his nephew. He may have known at the time what he was doing, and have appeared to act of his own free will, and yet have been influenced by a mind and hand in the background. How came he to form such a purpose? To give away a large estate without reserving one dollar to himself or providing for his support in his old age. Undue influence in such a case may fairly be presumed.

But more than that, the relations of the defendant to the plaintiff were such that it was his duty to protect his feeble old uncle from such an improvident act. It was unconscionable in him to accept such deeds, and he cannot, therefore, hold the property. These principles are clearly set forth in Huguenin v. Baseley, 14 Ves. 273; Houghton v. Houghton, 15 Beavan 299, and the later English and American cases cited in the foot notes of Story.

The second question to be considered is, is the compromise conclusive against the plaintiff? If he entered into that with a full knowledge of the facts, without fraud or imposition practiced upon them, then it should stand. But if he was misled, deceived or imposed upon, it is no barrier to his recovering the remainder of his property.

The terms of compromise were so manifestly unfair and unjust as to raise a reasonable presumption he was deceived and imposed upon. His claim was for the whole of the property conveyed to his nephew, charging fraud and imposition

in the execution of the deeds. The nephew had obtained title to real estate valued at more than one hundred thousand dollars, for which he had paid nothing, or, at most, the nominal consideration of two dollars. The old man is induced to compromise his claim by getting a deed for about one fourth of the property, and that encumbered to nearly its full value, while the nephew gets three fourths unencumbered.

The values put on the properties by competent witnesses before the Master, made the aggregate of the properties conveyed back to the plaintiff, $21,100; those retained by the defendant, $76,000, including the three properties he had purchased, and without them, $55,850. The properties the plaintiff got were encumbered with liens and debts he assumed to pay, including counsel fees in effecting the settlement, to over eighteen thousand dollars, leaving the amount he gained by the "compromise" of real estate, less than five thousand dollars. The property retained by defendant was unencumbered, and his share of debts, including $1,500 towards counsel fees, was less than $4,000, leaving him real estate clear, over $70,000.

It is very evident the plaintiff was mistaken in the amount and value of the property he was to get, for the defendant had manifested a willingness to compromise on one half, before the plaintiff had placed the matter in the hands of counsel, as appears from the testimony of defendant and Wm. Ward.

The counsel employed by the plaintiff never brought suit but seemed intent on a compromise; and, it would seem, engaged Capt. Ward to persuade the old gentleman to agree to one. After a few weeks of negotiation, the matter is closed by getting him to sign a brief and rather indefinite paper. There is no exhibit of the various properties and their values, and no proper statement of liens or debts. The defendant agrees to pay $1,500 for counsel fees for the plaintiff, but after the plaintiff gets his deed, he gives a mortgage to his counsel for $5,500 additional counsel fees. It is difficult to believe that a man of sound mind would understandingly make such a compromise and pay such counsel fees for effecting it.

The paper was taken to the house of plaintiff by Capt. Ward and signed by him under circumstances which shows he did not fully comprehend it. A paper of that character and importance, especially considering the age and feebleness of the plaintiff, should not have been presented for his signature, except in the presence of his counsel, and after the whole matter had been fully explained to him. Capt. Ward says he was acting as the friend and agent of plaintiff. This the plaintiff denies. From the testimony of plaintiff's counsel it seems he was employed by them and paid by them.

Mrs. Kelly testifies that Capt. Ward came into the kitchen with the compromise paper and said, "Mr. Kelly, I want you to sign this paper." Mr. Kelly said, "what paper, Captain?" He said, "that is to get all your property for you." Says he, "Captain, I will sign no paper; leave it with me until morning, until I understand what it means, and then I will sign it if I see that it is right." "No," says he, "I be damned if you do; you must sign it now, because it is getting late." Mr. Kelly says, "I can't sign it until I read it and understand what it means; can't you leave it with me until morning?" He said, "No, he would be damned if he would do it; that he should never get a brick unless he would sign it now." After further talk and pressing of that kind, Capt. Ward read the paper. Mr. Kelly then said, "This is to get all my property? That is what I want. If you tell me for a fact it is to get all my property, because I can't see very well." He says, "Mr. Weir and Gibson never mentioned anything about the paper to me." "Well, they ordered and sent it to you, and I want you to sign it." And he said, "On those conditions I will sign it to get all my property." So he signed it. To the same effect is the testimony of Hannah Smith, who was present, and of the plaintiff.

In opposition to this testimony stands that of Capt. Ward, and the fact that the plaintiff afterwards accepted the deed for the property mentioned in the paper. It is not, however, controverted that the paper was signed by the plaintiff at his house, in the absence of his counsel, and that it took some persuasion to induce him to sign it. It appears also from the testimony of his counsel that after he got the deed for a part of his property, he still supposed he could recover the whole, and wanted them to institute proceedings for that purpose.

In view of these facts, it is almost impossible to doubt that the plaintiff was induced to sign the compromise by fraud and imposition.

The defendant owns three properties which he did not obtain by deed from the plaintiff. He purchased and paid for these while he was receiving the rents and acting as agent of the plaintiff. They are valued at $20,150. In his answer he claims he brought "some little means" with him from Ireland, and since then had "earned large amounts of money from business outside of Edward Kelly, Sr.'s former estate. . . . . . That most of the property purchased by me was with money earned by me outside of this Kelly property."

In the testimony before the Master, he does not claim to have brought more than thirty or forty dollars from Ireland. Nor does he explain satisfactorily how he made the money to pay for these properties. He does not show any transactions

12 OUTERBRIDGE—4

"outside of the Kelly property," in which he "earned large amounts of money."

He presented before the Master a very brief and meager account of the rents he received from July 1st, 1873, to April 1st, 1878, and of expenses, &c. According to this account he received from rents . . . . . $36,831 00

He paid "taxes, insurance and re-
    pairs" . . . . . $13,372 24
He paid "debts" . . . . 10,148 99
   " "expenses" and "checks" 4,558 76
   " "boarding" . . . 1,556 00
   " loaned out . . . 4,225 15 $33,861 14

Balance . . . . . $2,969 86

Meager and unsatisfactory as this account is, it must be taken as true, for there is no other evidence on which an account could be stated. It may fairly be inferred from all the evidence that the defendant had no means, and made very little money "outside of the Kelly property." But he would be entitled to a fair compensation for attending to his uncle's business for five years. Besides, without referring the case back to the Master, to state an account, and ascertain how much of the plaintiff's money, if any, went into the purchase of these properties, we ought not to require him to convey them to the plaintiff. There can be no doubt, however, that these three properties are a most ample compensation to the defendant for all his services, not counting the personal property he received and the balance of rent, not accounted for.

So far as indicated in the foregoing opinion, the exceptions to the Master's report are sustained, and the others dismissed.

Let decree be drawn requiring defendant to convey back all the properties conveyed to him by the deeds of March 21st, 1874, and November 10th, 1874, not heretofore conveyed back; and that defendant pay all the costs of these proceedings.

The following decree was filed:

And now, to wit, June 23d, 1884, this cause came on to be heard upon bill, supplemental bill, answer, Master's report and exceptions thereto, and having been argued by counsel, it is now ordered, adjudged and decreed that the deed of Edward Kelly, Sr., to Edward Kelly, Jr., of date March 21st, 1874, as well as the two deeds of said Edward Kelly, Sr., to Edward Kelly, Jr., of date November 10th, 1874, referred to in the bill and supplemental bill in this case filed, were and are, and are hereby delared to have been fraudulent in law and absolutely null and void.

And it is ordered that the defendant do deliver to the plain-

[Kelly's Appeals.]

tiff the said mentioned indentures to be cancelled, and that the defendant do also forthwith re-convey by good and sufficient deed or deeds the premises described in the said deeds (except in so far as any portion thereof have been heretofore conveyed to Edward Kelly, Sr., by the said defendant, Edward Kelly, Jr.,) to the said plaintiff free and clear of any and all incumbrances done by him or any person claiming by, from or under him; and do also forthwith deliver up to the said plaintiff all the deeds and writings in his custody or power relating to the said premises in said deeds mentioned.

And it is further hereby ordered, adjudged and decreed that the said so-called agreement of compromise of date the 7th day of May, 1878, in the said answer of the said defendant referred to, be and the same is hereby declared fraudulent in law and absolutely null and void.

And it is ordered that the said Edward Kelly, Jr., the defendant, his heirs and assigns, be and are hereby perpetually restrained and enjoined from using or setting up the same against the plaintiff.

And it is further hereby ordered, adjudged and decreed that the said plaintiff shall be at liberty to apply to this court, by supplemental bill or other proper proceeding, for an account of the rents, issues and profits of the said premises herein ordered to be so re-conveyed, accruing since the filing of the opinion of the court in this cause, to wit, since September 26th, 1883, and up to the time of such accounting, and for the appointment of a receiver, pending any delay arising by reason of an appeal or otherwise from this decree.

And it is further hereby ordered, adjudged and decreed that the exceptions to the Master's report be and the same are hereby sustained, in so far as said report conflicts with this decree.

And it is ordered that the defendant, Edward Kelly, Jr., pay all costs of this proceeding.

Both parties appealed from the above decree. In the appeal of the defendant Edward Kelly, Jr., the specifications of error, (other than to findings of fact) were to the action of the court in overruling the Master's findings and report, in not dismissing the bill for want of equity jurisdiction, and to the said decree.

In the appeal of the plaintiff, Bridget Kelly, administratrix, the single assignment of error was as follows:—

The court below erred in not decreeing that Edward Kelly, Jr., the defendant, should convey to the plaintiff all of the real estate in said plaintiff's bill described, including that described especially in the 8th paragraph thereof.

*A. M. Brown* and *John Barton* for Edward Kelly, Jr.

*John Dalzell, D. B. Maxwell,* and *J. H. Mueller,* for Bridget Kelly, administratrix.

Mr. Justice GORDON delivered the opinion of the court January 5th, 1885.

The deed of Edward Kelly, Sr., to his nephew, dated March 21st, 1874, and the bill of sale of the same date, by which the former conveyed, on a parol consideration of maintenance, all his real and personal property to the latter, are not in themselves either void or voidable, though the transaction may be considered an improvident one. It is probable that a chancellor, were he called upon to compel the execution, by assignments or conveyances, of an unexecuted contract like that embraced in the papers above mentioned, would hesitate so to do. On the ground of inadequacy of consideration he might interfere to protect one who had improvidently agreed to divest himself of all his property on a mere oral promise of maintenance. But it is otherwise with an executed contract; inadequacy of consideration alone will not induce a chancellor to rescind such contract: Graham *v.* Pancoast, 6 Cas. 89; Aiman *v.* Stout, 6 Wr. 114. Nor, according to the same authorities, will mental weakness, where not sufficient to prevent a comprehension of the contract, nor mere hardship, warrant a rescission. As to the case in hearing, the court below agrees with the Auditor, that there was neither such mental incapacity, on part of the grantor, as would of itself avoid his deed, neither was there evidence of actual fraud on part of the grantee. But the case is put on the ground of constructive fraud, and Judge STORY is quoted as saying that equity will grant relief in cases where a confidence has been reposed and that confidence has been abused. But such abuse of confidence is rather an actual than a constructive fraud. Constructive fraud is a legal implication, and depends neither upon the good or bad faith of the contracting parties as between themselves. Here, however, admitting the ability of the one party to contract, and the good faith of the other in accepting the benefits conferred upon him by the contract, and there is no room for the intervention of a legal policy, since by the transaction no implication can arise of the infraction either of law or public policy. We know of no obstacle, legal or moral, in the way of one who is of sane mind and free of debt making a gift of a part or the whole of his property to another, much less in his transferring it in consideration of maintenance. All this is obvious and undisputed, and the court, in its endeavor to avoid the principle here stated,

and to relieve the plaintiff from what it esteemed an improvident contract, raised an issue and came to a conclusion not warranted by the facts of the case.

It is said, inter alia : " Nor is it a sufficient answer that Edward Kelly, Sr., knew what he was doing and appeared to act voluntarily, without any influence on part of his nephew. He may have known at the time what he was doing and have appeared to act of his own free will, and yet have been influenced by a mind and hand in the background. How came he to form such a purpose ? To give away a large estate without reserving one dollar to himself or providing for his support in his old age. Undue influence in such case may be fairly presumed." Here is, first, an assumption of undue influence without one particle of evidence to support it; on the contrary, the Master finds as follows : " In no instance during the whole transaction does the hand or influence of the defendant·appear, either directly or indirectly. On the contrary, the testimony of Mr. Mitchel, as above stated, and the declaration of the plaintiff, made in 1878, four years after the transaction as testified to by Capt. Ward, ' that all the lawyers in town would not have made him deviate from what he intended to do,' show this transfer to have been the deliberate act of the plaintiff, when in the full possession of his faculties, after consultation with able and disinterested counsel of his own selection, who fully informed him of the consequences of his act, and cautioned him against it, and done after time for deliberation, after having been advised of the consequences of the proposed act." Then there is, second, in this statement of the court, the further assumption that Kelly gave away his large estate without reserving one dollar to himself, or providing for his support in his old age. The Master, on the other hand, finds, that at the time of the transfer of the 21st of March, 1874, there was a verbal agreement between the parties by which the defendant undertook to provide for the wants of the plaintiff during his life, including the use and occupancy of the house on Ross street, and also to convey, after the plaintiff's death, a portion of the real estate to certain persons then and there agreed upon. Here certainly was a good and legal consideration, notwithstanding the court's assumption to the contrary, and one that was executed to the letter. For though the latter part of this parol agreement might not be enforceable under the statute of frauds and perjuries, yet this defect was cured by the execution of the deed of trust of November 10th, 1874. What remains simply goes to fortify the conclusion of the Auditor.

The defendant seems to have been wholly obedient to the will of his uncle. The two deeds, of November 10th, 1874,

embracing the same property as that conveyed by the deed of the 21st of March, 1874, and the declaration of trust, as above stated, appear to have been drawn and executed at the instance and dictation of the plaintiff without any previous consultation with his nephew. So, when we come to the paper of the 18th of April, 1876, by which the defendant assigns to his uncle the rents of all the property which had been conveyed to him, we see in it a disposition on part of the nephew to submit to whatever his uncle required of him.

In fact, between these parties there was no jar or discord until after the plaintiff's second marriage ; until that time they were as father and son ; but this new relation seems to have broken the previously existing harmony; the old man demanded a re-conveyance of the property; this the young man refused to do, and thus a dispute arose which led to the compromise of May 7th, 1878.

·Here, it might well be supposed, all possible controversy had an end. There could be now no secret and undue influence of the nephew over his uncle ; the parties were at arms length ; Edward Kelly, Sr., was now married, and his wife may be presumed to have had some common sense even though her husband had not. He had the counsel and advice of three able lawyers ; the compromise was most carefully considered, deliberately executed and delivered, and he took and has since retained the possession of the property conveyed to him by it. Nevertheless, the court below, in commenting on this part of the case, says : "In view of these facts it is almost impossible to doubt that the plaintiff was induced to sign the compromise by fraud and imposition." But in view of what facts, or by whose fraud and imposition ? That the property he received by the compromise was not worth nearly so much as that retained by the defendant ? That the counsel employed by him did not bring suit, but rather preferred a compromise ? That their fees were excessive, and that his friend and agent, Capt. Ward, urged him too strongly to sign the agreement ? But in this connection a few things, evidently overlooked by the court, are to be remembered: (1) That the fee to the entire property was lawfully in the defendant, and that what he re-conveyed to his uncle was *ex gratia*, and not of any legal compulsion. (2) That as the facts of the case did not warrant the bringing of a suit, his counsel were wise in preferring a compromise. And (3) On the day after the evening on which Capt. Ward brought the compromise agreement to him for his signature, he carefully re-examined this paper with his three attorneys, and, acting under their counsel and advice, approved of it, and agreed to its subse-

[Mining Co. v. Jones.]

quent delivery. But it may be pertinently asked: What had the defendant to do with all this?

If the plaintiff's friends and counsellors imposed upon and defrauded him, a conclusion which neither the character of these gentlemen nor the testimony warrants, how can the defendant be compromised thereby? He can no longer be charged with the guardianship of his uncle, or made responsible for his uncle's improvidence. In this compromise he acts for himself alone, and if by it he has got the better of the bargain, he has it by no unfair or unlawful means, hence, the plaintiff, or rather those who now represent his estate, have no equitable ground of complaint.

In the appeal of Edward Kelly, Jr., the decree of the court below is reversed and set aside, and the plaintiff's bill dismissed at the costs of the appellee.

Bridget Kelly's appeal is dismissed at costs of appellant.